Our first case is case number 21-2066, United States v. Young. Counsel. Good morning. Please the court and counsel. My name is Tim Kingston and I'm here representing the appellant in this matter, Apache Young, who has been convicted of being a felon in the apocryphal description of it and where he's been sentenced to 235 months of incarceration, which he's presently serving. On behalf of the appellant, I'm presenting two basic arguments. First, Mr. Young and I would argue that from the very inception of his encounter with law enforcement in this case, that there was not a reasonable basis to detain him or to detain him for the period of time that he was detained. Second, assuming for a moment that the initial detention was legitimate, legally allowed, specifically by an officer named Harvey, who's referenced in the briefs and in the record, we argue that he did not have a reasonable basis or reasonable suspicion, pardon me, sufficient to warrant anything other than the very brief initial detention of Mr. Young. So the second one goes just to delay. Pardon me. Okay. And I would argue that once it was, as here in this case and as the facts clearly show, that there was a lack of a reasonable basis to continue to detain him, that he should have been released. Counsel, at what point did the delay begin? I believe it, we knew that here, I'll answer it a little bit in a lengthy way, not terribly lengthy, but That seems like an oxymoronism. Thank you, I appreciate that. We know that Officer Harvey's on a bluff about a third to a half a mile away from this truck that he sees over in what's called the West Mesa. And he sees a figure, which he testified at the suppression hearing, he thought had some kind of dark object in his hand. He thought his suspicion was that it was a holster, but he wasn't sure because of the distance. He testified he didn't see a gun at that point in time. So he goes up to Mr., goes down to where Mr. Young is. Mr. Young identifies himself. The officer at that time, Harvey, doesn't see anything illegal at that point in time that was being done by Mr. Young. He was in a legal place. Mr. Officer Harvey quickly learned that the truck had not been stolen, in fact, belonged to a relative, Mr. Young's mother, in fact, and Mr. Officer Harvey hadn't seen a gun at that point in time. He had walked around the truck. So at that point in time, to answer your question, I believe that Mr. Young should have been allowed to go at that point. And anything that occurred after that point was unreasonable and should not and should have led to ultimately to suppression. Did the officer know that this was the truck was owned by the mother? The officer knew it was a different person. But did the officer, when did the officer know that that other person was, in fact, Young's mother? Yeah. Mr. Young quickly told him it belonged to a relative of his. He learned, I think, quite early on that his officer, Harvey, learned quite early on. He had called dispatch. Dispatch told him very early in the encounter. The name of the other person, and it wasn't Young, but when did they learn it was the mother? I believe it was in the first contact with dispatch. Well, I might qualify that to say he was told it had not been stolen, that it wasn't reported stolen. Right, right. You got that. Yeah. Yeah. So at that point in time, what does Harvey have? I would argue to the court he doesn't have anything to continue. Well, counsel, when he's talking to dispatch and dispatch informs him that he's, that your client is under a discharge status, at that point. That occurred quite a bit later on, Your Honor. I believe the record would show. Well, I'd like to know what you think would, let's just assume that everything up until that point, if we're analyzing the issue of delay at that point, would he have, would the officer at that point have obtained reasonable suspicion based on the communication about discharge status? No, because with discharge, I would argue no, Your Honor, because what dispatch told him was that he was, could have been either on probation or parole, and dispatch told him nothing about what the nature of whatever probation or parole that the person might be on. In other words, dispatch did not tell Officer Harvey that there was a felony that related to Mr. Young. So I don't believe that would have been sufficient. So you're saying that the next call that he made was that unreasonably extended? You're talking about the final call when he Well, that's when he found out with that third call. Right, and I guess my question is, why should we expect him to not make that third call at the point when he learns that the, that your client is on discharge status? I mean, I would argue, Your Honor, that the Fourth Amendment builds in, you know, safeguards your checkpoints, which, you know, in this case, they were passed time and time and time again. Harvey, one, you know, as he testified, he was scrambling, trying to find any reason that he could continue to detain this person, so that, because he, in his mind, he had to be a felon. He had seen tattoos that raised some kind of suspicion in his mind, and it got him warranted. But he was, as I said, scrambling to find something that he continued to hold this person on. So he makes his Well, he had found the gun at that point in time, so. Can you just give us two checkpoints that we can measure everything by? When do you think the Terry stop began, and when do you think the arrest occurred? What event, what moment in time? Well, the Terry stop was from the very beginning. So the Terry stop was the original encounter. Yes. From day, from the instant it started. And when did that, when, what moment do you think that transferred into an arrest? Well, ultimately, he was arrested at that time of the third call. When do we stop applying a legal standard for a Terry stop and start applying a legal standard for arrest? I would say immediately, based on the first argument I was trying to make, Your Honor, which was, he comes up to Mr. Young. He doesn't see any evidence of crime. He doesn't see a gun at that point in time. Mr. Young cooperates with him, tells him his name, gives him his social security number. At that point in time, I think, because Mr. or Officer Harvey continues to hold him, that's when the arrest analysis would begin, Your Honor. What do you say, I mean, it seems like we're arguing the case with a few facts missing. And so one of them is, is when the officer pulled up, he, you say, saw what he thought was a holster. Right. Fair enough, but I think the officer would probably be entitled to a reasonable inference that that was, holster was not just empty. And so he sees a guy from a distance with a gun is, is putting the holster in his vehicle. And then he asks him if he has a gun. And he says no, which is inconsistent with the holster. If it were a holster. Well, was it? Or was it just a gun? But how does Officer Harvey know it's a holster? I mean, he's a third to a half a mile away. I mean, he said he could see it. I mean, you're, you're, you're, you're quibbling with the probative value of his testimony. I understand. And so I guess what I, what I'm wondering from you is it seems like what's happening in this stop is the evidence is building as time is going on and giving him more reason to detain him. And in the, in the, in the, in the lie itself about the gun is, is something that's fairly important here, at least under our precedent. You know, when an officer, you know, IDs a weapon, or in this case a holster, which presumably contains a weapon, and you say you don't have one, then it seems like that's kept building. I don't see anything else that, from Mr. Young's perspective, that there was more and more evidence being collected here. Or... Well, I mean, so Mr. Young walks up to him, and at that point all we have is an open door. And, and what, and, and a distant view of what we think's a weapon. And then we have conduct that the officer believes is diversionary. And then we have a call that says he's on discharge, probation, or parole, which seems to indicate that there could be a felony in the background. And then we have a final call that confirms it. It just seems like that every step he took, it, more justification occurred. I'm not trying to pick apart each individual piece of that, but all of it put together doesn't, I would argue, doesn't rise to the level of reasonable suspicion to continue to hold onto him. Officer Harvey, I know this isn't dispositive, but in the footnote in the brief, he had stated that if Mr. Young, way up until the time of that third call, had said, I'm out of here, I'm leaving, I'm going to go, that Harvey would have let him go. Because even in his mind, I know that this is an objective view that the court's taking. But even in Harvey's mind, the person who's right there who is presumably building up this body of evidence in his mind, he believed that he didn't have enough to hold him. And I think that's a very important factor. Because, you know, his gestalt told him, I don't have enough to hold this guy. And then he finally gets the third call. Well, it's your position, though, that, I mean, he couldn't have held him at all. When he pulls up and all he has is a shirtless guy with a car door open and a car that's not stolen, that he should have just been able to leave right then. I believe so. And we also know, as I pointed out in the brief several times, that possession of a firearm in New Mexico, carrying a firearm in New Mexico, is perfectly legal. In contrast to some of the cases that the government has relied on where a person had a firearm in a place where it might have been a danger to other people, that certainly was not the case here. You know, the cases relied on by the government are such as, you know, a store clerk had a gun tucked in his back and around other people. And so that's a different situation than what we have here. A person out in the middle of nowhere, you know, maybe with a gun. Well, high crime area. Pardon? High crime area. According to the record, yes. Well, not just high crime. I mean, he said he had encountered hundreds of vehicles there. I mean, a very high crime area for stolen vehicles. But he, Your Honor, he very quickly finds out this vehicle had not been stolen. No, but I mean, that's a factor that's plugged into his initial response. True. Justifying, beginning to justify what he did. I mean, it's not the full story, but it's the beginning of the story. It's the beginning of the story to allow him to go up and talk to Mr. Young. And then once whatever speculation he might have had in mind at that point was dispelled, as I've described, or at least as I would argue, that that should have been the end of the detention. He should have said to Mr. Young, thanks for your cooperation. You're free to go. Would you agree that if he approached him based on suspicion of one crime, and while he did it evidence of a different crime was developing, that it would be appropriate for him to go forward and, you know, take some steps to investigate the crime that he saw developing, even though it wasn't the reason he approached him in the first place? If I can ask a question, you're saying, you know, Harvey being in this area of high crime with stolen vehicles, that he might have been investigating in his mind that crime? Well, I mean, I think the record demonstrates that he approached him because the vehicle was in a, looked like other vehicles that had been stolen, where it was out in the middle of nowhere with the door open. But that would be for, I understand Officer Harvey's view of it, that would be vehicles that had been abandoned. And so he looks down, at first he doesn't see Mr. Young. Mr. Young may have been in the cattle watering tank doing whatever. And then Mr. Young comes out. So it's not an abandoned vehicle like Officer Harvey says that he's seen hundreds of times out on the West Mesa. So, okay. With that, I guess I have 14 seconds left. I don't know if the court has any other questions. I'd be happy to answer them. Thank you. Good morning, Your Honors. May it please the court. My name is Emil Keeney, and I'm with the U.S. Attorney's Office in Albuquerque. And, of course, I'll start by addressing some of the questions that you asked, unless, of course, you want me to answer different ones. But the scope of the claim, I think that was one of the first questions, is when did the defendant contend the unreasonable delay starts? And today he said, well, it started when he found out that the truck, at least the truck had not been reported stolen. But in his brief, if you look at page 20 and 21, in his opening brief, he says it's when, not only when he found the truck hadn't been reported stolen, but also when, at the time that Officer Harvey discovered that there were no outstanding warrants. And that was at a later point. So, in our view, he hasn't contested anything before that. But even if that were true, that the period of claimed unreasonable delay begins at the time when he finds out the truck hadn't been reported stolen, we think there's still reasonable suspicion that he was a felon in possession of a firearm. I mean, the officer thought he might be trying to conceal the firearm, to distance himself from it. He didn't disclose the existence of the firearm when asked about it. What is your view of the evidence on that? So, opposing counsel's argument sounded to me like that the officer really never even thought he saw a firearm. No, I don't think that's the case. I think he thought it was a firearm. And that's what he testified. He testified at the suppression hearing to that. But he also testified in more detail, and I think I've included sites in this. It's in Volume 3 of the record. It was during the second trial. And now, that's not the suppression hearing, but under your case law, you can consider a testimony from trial if it supports the district court's suppression ruling. And he went into a much more detailed explanation of exactly why he thought that the defendant had a gun, as opposed to some non-firearm object. You said he saw a gun. Did he ever see the gun apart from the holster? No, he was carrying it in the holster. So, he didn't see the gun. He saw a holster. And he presumed it was a gun inside there. Yeah, he thought it was a gun. But he saw it. I think he testified he saw it. He never saw the gun separately. Okay. Let me ask you about the tattoos. So, there's a lot of discussion about how the tattoos made him think that they were prison tattoos and that the guy must be a felon because they were prison tattoos. And there's some authority to that effect that's out there that talks about it. But it seems to me that that authority is a bit older authority. And I'm just wondering if, in today's environment, if developing suspicion based on somebody having a lot of tattoos is a problem because, man, more and more people have lots of tattoos. Yes, Your Honor. I don't think it's a problem because, first of all, your case law, it is from the cases we've cited that approve, that say that tattoos can form part of the basis for reasonable suspicion, are from 2006 and 2012. So, while they are a few years old, I don't think they're ancient. But I think what allowed Officer Harvey to make this inference was he didn't just say that anyone who has a tattoo, that is an indicator that they might be involved in criminal activity or might have been possibly in prison. He was able to explain exactly why he thought that. Because they were blue? Right. I mean, you're not going to argue tattoos is the basis for reasonable suspicion in this case, right? It's not the only basis, no. The district court didn't think it was? District court said he was slightly persuaded by it. It wasn't the most important factor in the district court's analysis, but he did accept it. So, can we talk about each of the factors that support reasonable suspicion? Yes, ma'am. Because you have a case where you need all of them, right? I mean, you don't have an independent basis for any of these. It's not a cumulative situation. You've got high crime, truck door open, emerging shirtless from the tank, thinking there might be a holster, gun, and the prison tattoos. You need all of that, right? Nothing independently supports reasonable suspicion in this case. You're looking at, you need everything, right? No, I don't think I need every single one of those. For example, even if you took out the tattoos, he still lied about having the gun, for example. So, can I ask you about that, actually? Yeah. Did the district court rely on that fact? It did not. It did not? It didn't say anything. To be more precise, it found that that is what the defendant said, that he didn't have one. But in its analysis, the district court does not mention it. But I still think this court can consider it as part of the reasonable suspicion. The district court didn't find that it didn't count against it. So, what weight do we give that, if any? If the district court did not consider it as part of its legal analysis, but only as a factual finding? Well, I think the general rule is that a court can affirm based on any ground that's found in the record. So, that's an alternative ground for affirmance? Yeah, because the district court didn't actually consider that as part of the act. It could be an alternative ground for finding reasonable suspicion, or at least you could consider that as part of it. But even if he didn't have that fact, then you still have the prison tattoos and his effort to at least distance himself from the gun. What about the officer's testimony that he felt like he was trying to divert him away from him into some other scene by saying, yeah, I think I saw an abandoned car down the way there. What's your case law on that? On trying to divert? I forget exactly what case we cited, but I recall citing one in the brief that talked about district court, if you're trying to direct officers somewhere else. I'm sorry, I don't recall. I actually have a follow-up question to that, but as a factual matter, not as a legal matter. Where in the record do the officers make this assertion? I don't remember seeing it in the record, and certainly could have missed it. Make the assertion that, I'm sorry. That there was some sort of misdirection in play. Well, at the suppression hearing, he testified, Officer Harvey testified. It was at the suppression hearing? Yeah, and I think in the statement of facts, I would have cited that. I don't have the exact site to mind. One of the other questions that was asked is when did, exactly when did the, I think, I'm sorry, I forget which judge asked, but which are the benchmarks for when the reasonable suspicion, or when the stop, the Terry stop began and when it ended? The Terry stop didn't begin, we don't contend that it began at the beginning of the encounter. It began when, and this is what the district court found, and you can find that at volume one of the record at page 185. We found it started when Officer Harvey asked for defendant's knife and told him to hang tight right here. That's when the district court found it started. I don't understand the defendant to be arguing anything different today. And then it ends, I think you pass out of Terry stop territory, when the probation, the representative of the probation department person that Officer Harvey called said, yes, he does have a felony record. He has a felony conviction. At that point, he has probable cause to think that he's a felon in possession of a firearm. So the arrest began when he found out that he had a record? That's when Terry stop began. Tell me again the event when the arrest began. The arrest begins I think a few minutes after that, after he finds out about the felony record, because you'll see on the tape what Officer Harvey does then. And what was the triggering event for the arrest, did you say? What led him to decide to arrest him? No, no, the event that was the arrest. What constituted the arrest? When he walked over later on after that call and put handcuffs on him. So the arrest was not until handcuffs came on him? That's correct. So you don't think he was, his freedom to leave preceded the handcuffs? Well, he wasn't free to leave because the officer told him hang tight right here. Well, of course, a Terry stop, you're not free to leave either. Correct, we consider that to be the Terry stop, and then the arrest, the full arrest to occur after the probation, I'm sorry, told him. The handcuffs was the triggering, is the dividing level there, the dividing point between a Terry stop and the arrest was the handcuffs. Well, what I would say is there's Terry stop ends when he finds out probable cause exists, but it was still a couple of minutes later until he arrested him, because what Officer Harvey did then was he called to make, I think he testified at the suppression hearing, well, at the suppression hearing at least, I'm concerned about whether, you know, there's only two officers here, I'm concerned about if he's going to run or something, so he called for backup, and then he called for someone to meet him. They're kind of about half a mile from the road, so he called for another car to come so that he could walk the defendant out after he arrested him. He's basically making arrangements for the arrest, preparations for it. Making preparations for an arrest does not trigger a legal definition of the arrest. That's correct. At all. So, again, I just want to know what the government's position is as to when the transition changed and when your standard of evidence will change, and you say it's when the handcuffs came on and not before. What I say is when Officer Harvey found out that he's a felon, that's when probable cause begins, but he doesn't actually effectuate the arrest instantly. He makes preparations to effectuate the arrest, and then he goes and does it. And that's at the very end, I think, of lapel video two. You'll see that happening, Your Honor. Unless the court has any more questions, I would ask that you affirm the rulings of the district court. Thank you. Okay, thank you, counsel. You have seven seconds. Do you? I'll pass it. Okay. The case will be submitted, and counsel are excused. Thanks to both of you for your arguments.